Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (SBN 365099)
nicolec@salahilaw.com
Taylor Applegate (SBN 357742)
taylora@salahilaw.com
**SALAHI PC**
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 236-2305

Albert J. Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl Street
Boulder, Colorado 80302
Telephone: (303) 720-7095
Email: albert@plawinski.law

*Pro Hac Vice admission forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| E.R. and C.N., individually and on behalf of all others similarly situated,<br><br>        *Plaintiffs,*<br><br>    *v.*<br><br>TWILIO INC., a Delaware corporation,<br><br>        *Defendant.* | Case No. 26-cv-2609<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Violation of 18 U.S.C. § 2511**<br>**Violation of 18 U.S.C. § 2512**<br>**Violation of Cal. Pen. Code § 631**<br>**Violation of Cal. Pen. Code § 632**<br>**Violation of Cal. Pen. Code § 635** |

Plaintiffs E.R. and C.N. bring this class action complaint individually and on behalf of all others similarly situated against Twilio Inc. ("Twilio" or "Defendant") for unlawfully intercepting sensitive medical information from Grow Therapy patients, without their consent.  Plaintiffs bring this action based on personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1.    Defendant Twilio markets itself as a "cloud communications platform."  While it began as a communications company, offering online communications services to various business clients, its suite of services grew over time to include both communications services and services that enable its clients to analyze the *content* of those communications.  Among this latter suite of tools is a website communication tracker called "Segment."  Segment "[c]ollect[s] real-time [consumer or patient] data" whenever consumers interact with client businesses, and generates "unified profiles," which are later shared with "550+ destinations," including advertisers and marketing agencies.  The primary purpose of the Segment Tracker is to surreptitiously eavesdrop on the communications between individual consumers and websites that embed Twilio's Segment Tracker, and to monetize that information through various means.

2.    Grow Therapy owns and operates a telehealth platform for mental health services, allowing patients to search for mental health professionals by specialization and insurance coverage.  Grow describes its platform as follows: "Grow Therapy (Grow) is an online therapy platform making it easier to access high-quality, insurance-covered therapy and psychiatric care. With a network of over 25,000 licensed providers and coverage for 220 million Americans, Grow delivers care that's easy to start, affordable to continue, and grounded in trust."  Indeed, Grow offers its therapy services throughout the United States and in all 50 states.

3.    Unbeknownst to Grow's patients, Grow installed Twilio's Segment Tracker on its website platform, enabling Defendant Twilio to surreptitiously collect and analyze patients' sensitive mental health information from the moment they begin using the platform.

4.    Indeed, Twilio's Segment Tracker begins collecting and analyzing patient data from before a patient is even enrolled in Grow's therapy services long term.  Patients begin by navigating to Grow's website and answering questions about their location, insurance coverage, and mental health issues (such as anxiety, depression, trauma, etc.).  Grow then provides a list of mental health providers who match the patient's criteria.  Patients can view the provider's profile, book a virtual therapy session, and have Grow submit all insurance claims relating to the patient's mental health treatment on their behalf.

CLASS ACTION COMPLAINT                    2                    CASE NO. 26-cv-2609

5.    Patients provide highly sensitive, personal information to avail themselves of Grow's services, including the patient's full name, email address, phone number, location, the therapy services being sought, intimate information pertaining to the patient's mental health diagnoses and preferred treatment methods, and payment information (including the patient's insurance ID).  Patients also select their chosen providers and make appointments using the Grow platform, meaning data about the time and date of their scheduled therapy sessions and the provider's name are integral data points collected by Grow.

6.    Unbeknownst to patients, as they enter this highly sensitive and confidential information into Grow's online platform, a silent third party, Twilio, collects and analyzes this information without their knowledge or consent.

7.    Patients in our health care system expect that communications with their health care providers will be kept private.  Indeed, federal law such as the Health Insurance Portability and Accountability Act ("HIPAA") and state statutes like the California Medical Information Privacy Act ("CMIA") strictly prohibit anyone from disclosing or obtaining any health information pertaining to an individual without authorization.  This means that any data related to a patient's medical health and treatment histories—including their patient status and payment for medical treatment—must be kept confidential and secure.  No third parties may receive this type of medical data or disclose it further without explicit patient consent.  Given these protections and widespread social stigma associated with mental health treatment and illness, patients reasonably expect that all information related to their mental health treatment will remain private and confidential.

8.    Plaintiffs, individually and on behalf of the putative Class, bring this action to enjoin Twilio from obtaining and using Grow patients' sensitive medical information, and to recover statutory damages for violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511 and 2512, and the California Information Privacy Act, Cal. Pen. Code §§ 631, 632, 635.

**PARTIES**

9.    Plaintiff E.R. is a natural person and adult citizen of the State of California.  He resides in Oakland, California.

10.    Plaintiff C.N. is a natural person and adult citizen of the State of California.  She resides in Berkeley, California.

11.    Defendant Twilio Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 101 Spear Street, Suite 500, San Francisco, California 94105.

### JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it raises a federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state law claims, which arise out of a common nucleus of operative facts.

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

14.    This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, in a substantial part, in the District.

### DIVISIONAL ASSIGNMENT

16.    Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco or Oakland Division because at least Plaintiffs reside in this District and a substantial part of the events or omissions giving rise to the claim occurred within the county of San Francisco.

### COMMON FACTUAL ALLEGATIONS

**A.    Patients' Mental Health Treatment Information is Private and Confidential**

17.    Patients generally expect that information pertaining to their pursuit of mental health services is kept confidential.  There is an expectation that communications with prospective mental health providers will not be shared with third parties without patient consent.

18.     This expectation of privacy is reinforced by the many laws that address, and prohibit, the sharing of an individual's medical information with third parties.  For example, under federal law, it is unlawful for health care providers—including mental health providers and therapists—to disclose, and for any person or corporation to obtain, "individually identifiable health information" without the patient's express written authorization.[1]

19.     The term "individually identifiable health information" refers to any information, including demographic information, that is created or received by a health care provider and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual" and either identifies the individual; or there is "reasonable basis to believe that the information can be used to identify the individual."[2]

20.     The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties concerning patient health data, and defines the term "Protected Health Information" ("PHI") broadly to include individually identifiable health information transmitted or maintained in any form or medium, subject only to narrow exceptions.[3]  "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[4]

21.     Any person violates the HIPAA Privacy Rule if it knowingly and in violation of the act "obtains individually identifiable health information relating to an individual [or] discloses individually identifiable health information to another person."[5]

22.     HIPAA defines "individually identifiable health information" as:

> **any information**, including demographic information collected from an individual, that— (A) **is created or received by a health care provider**, health plan, employer, or health care clearinghouse; and (B) **relates to the past, present, or future physical or mental health or condition of an individual,** the provision of health care to an individual, **or the past, present,**

---

[1] 42 U.S.C. §1320d-6.
[2] 42 U.S.C. §1320d(6).
[3] 45 C.F.R. §160.103.
[4] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.
[5] 42 U.S.C. § 1320d-6.

**or future payment for the provision of health care to an individual**, and— (i) **identifies the individual**; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[6]

23.     Health care organizations regulated under HIPAA, like Grow, may use third-party tracking tools in a limited way to perform analysis on data key to operations.  However, they are not permitted to use these tools in a way that may expose patients' PHI to vendors, including Defendant Twilio.  As explained by a statement published by the HHS (the "Bulletin"):

> Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[7]**

24.     The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, **frequency of visits to a therapist** or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[8]**

25.     Plaintiffs and the Class face exactly the risks over which the government expresses concern.  Grow's unlawful conduct allowed third parties to intercept information regarding Plaintiffs and proposed class members' therapy appointments and needs.

26.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> The information disclosed might include an individual's medical record number, home or **email address**, or **dates of appointments**, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code.[9]

---

[6] 42 USC § 1320d(6) (emphasis added).

[7] *See* U.S. Dept. of Health & Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities & Business Associates* (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added).

CLASS ACTION COMPLAINT                    6                    CASE NO. 26-cv-2609

27.     Crucially, the Bulletin clarifies:

**[Individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI,** even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.[10]

28.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. **These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.**

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including **health conditions**, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.**[11]

---

[10] *Id.* (emphasis added).

[11] *See* Federal Trade Commission, *FTC & HHS Warn Hospital Systems & Telehealth Providers about Privacy & Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

29.     As made very clear by the FTC and the HHS, the disclosure of patient data via tracking technologies is directly contrary to federal law.

30.     Furthermore, the California Medical Information Protection Act makes it unlawful (and imposes a civil penalty up to $2,500 per violation) for any person or entity who knowingly and willingly obtains or uses medical information without written authorization from the patient.  Cal. Civ. Code § 56.36(b)(5).

**B.      Overview of Tracking Technology**

31.     Twilio markets Segment as a "customer data platform," that is, a tool that allows Twilio clients to "collect data from people who visit [the client] website, use [their] products, or visit [their] physical locations."

32.     Once Segment collects first-party data from consumers, it views and analyzes the data in "real time" to generate "user profiles" for each person that visits the client website, storefront, or application.

33.     Segment promises that its corporate clients will be able to "[s]ave time and compute costs by **letting Segment build the complete history of each customer** across all online and offline touchpoints into real-time, identity-resolved profiles" and "[s]titch together each customer's journey between multiple user sessions and devices with deterministic identity resolution, while enabling centralized privacy and governance."  Segment's "user profiles" promise to create a digital dossier of the consumers' activity across various devices.

34.     Twilio continues:

Segment Unify **collects data from all your sources**—including your data warehouse—and automatically **matches and merges** it to create unified, always up-to-date customer profiles.

With warehouse interoperability, Unify **lets you both enrich profiles with data from your warehouse and send unified profiles back for advanced analysis**. Instantly activate these Segment profiles across your favorite marketing, analytics, and customer engagement tools to deliver personalized experiences and power smarter business decisions at every touchpoint. (emphasis added).

35.     The key feature of Segment's profile-generation is identity resolution, that is, allowing Segment to deanonymize consumers and to create a single profile with all of their activities and interests: "Identity resolution allows you to stitch together user behavior across platforms, anonymous

or known state, or device, which allows you to see the entirety of a user's journey and combine their customer data into a single golden profile. It is essential for understanding customer needs and preferences, as well as creating personalized customer journeys . . . ."

36.    Twilio explains how Segment identity resolution views and analyzes customer data:

Unify resolves user identities in a deterministic manner. The Identity Graph supports multiple external IDs without any additional code. **Each incoming event is analyzed**, the external IDs are extracted, and then the Unify identity resolution tool **algorithm matches events with profiles**. A simplified version of the algorithm is as follows: Segment first searches the Identity Graph for incoming external IDs. If Segment doesn't find a matching profile, a Profile is created for that user. If Segment finds one Profile, the event is logged onto that profile. If Segment finds multiple matching profiles, Segment applies the identity resolution settings to add the event to the appropriate profile. (emphasis added).

37.    On information and belief, Twilio uses artificial intelligence technology to analyze this first-party data as consumers interact with Twilio client platforms, thus "[a]utomatically augment[ing] unified customer profiles with real-time, AI-generated traits—like likelihood to convert or churn—for downstream use in personalization and automation."  Twilio's AI software can predict the likelihood that a consumer will perform any action, for example, his or her propensity to purchase additional services or predict their lifetime value to their client ("LTV").

38.    Twilio retains all collected data, including Plaintiffs' and proposed Class Members' Sensitive Medical Information on its servers, thereby allowing Twilio to (either now or anytime in the future) leverage the collected data for its own benefit and purpose.

39.    Twilio can use the Sensitive Medical Information for advertising purposes.  Twilio offers over 700 integrations including with advertising partners such as Meta, Google, and Snapchat among others.  Twilio represents that its Segment tools "Collect first-party data from every touchpoint and send it to any tool…"  As shown in Figure 1, Segment has the ability to share a consumer's profile, including the actions he or she took on a website or app, and further disclose it to advertisers.



**(Figure 1)**

40.    For example, integrations like "Facebook Custom Audiences" allow Twilio to share collected data between Facebook and Segment.  Twilio can use Facebook data to identify customers and Twilio can feed Segment data back to Facebook to target audiences.  "Using Facebook Custom Audiences with Personas simplifies the audience creation and uploading process.  Personas automates the manual process of resolving disparate customer data across devices and channels.  With the Segment Identity Graph, Personas intelligently merges all user data into complete, customer-level profiles. This way you know that you are targeting the right people with the right ad."

41.    As relevant here, Twilio's Segment Tracker further disclosed the collected data to fourth parties: 1) VWO and 2) Full Story.

42.    Twilio entered into an agreement with Grow Therapy not only to receive Grow patients' Sensitive Medical Information and process the data for its own use, but Grow Therapy also granted Twilio the right to use the Sensitive Medical Information to develop new products as well as to improve its existing AI-driven products and services.

43.    The Twilio Privacy Notice—which is part of the agreement between Grow Therapy and Twilio—explicitly states that it uses collected data for "[d]eveloping or improving our Services. . . ." The Twilio Data Protection Addendum further states that Twilio uses customer collected data "to

develop and improve new products and services and improve the performance, functionality, safety, and security of the Services." Twilio thus has the ability, and indeed the practice, of using first-level data obtained from intercepting consumer interactions with client platforms to improve the products and services it offers *to the rest of Twilio's clients*.

44.    Indeed, Twilio already has used customer data to publish an annual "CDP Report" which it uses for its own marketing purposes. The report showcases what data Twilio collects with the use of the Segment Tracker, where Twilio further rediscloses that data, and how its customers are using the platform. As such, Twilio not only accessed the data it collected but also analyzed it and leveraged it for its own benefit to promote and monetize its products and services.

### C.    Grow Therapy's Use of the Segment Tracker

45.    Grow Therapy offers a telehealth platform where patients can book and attend therapy sessions. Patients begin by answering basic questions including 1) their requested therapy type (e.g., talk therapy or medication management), 2) their location, 3) insurance information (including the name of their insurance provider or whether they are a cash payee), and 4) their "needs" which include a comprehensive list of health issues and unique provider/patient requirements such as anxiety, depression, ADHD, women's issues, LGBTQ, addiction, sexual abuse, among others. *See* <u>Figure 2.</u>



**(Figure 2)**

46.    When a patient selects "Find provider" the Segment Tracker intercepts and duplicates, *in real time*, the patient's inputs and descriptive URLs then transmits it to its own servers. As shown in the example in <u>Figures 2 & 3,</u> Twilio collected the patient's search for a 1) talk therapy provider, 2) in

the State of California, 3) who specializes in Anxiety & Depression, and 4) who accepts the patient's Aetna insurance. *See* Figure 3.

```
"page":{
  "path":"/categories/california/aetna",
  "referrer":
    "https://growtherapy.com/categories/california/aetna?address=CA%2C%20USA&specialty%5B0%5D=Anxiety&specialty%5B1%5D=D
    epression&setting=Virtual&typeOfCare=Talk%20therapy",
  "search":
    "?address=CA%2C%20USA&specialty%5B0%5D=Anxiety&specialty%5B1%5D=Depression&setting=Virtual&typeOfCare=Talk%20therapy
    ",
  "title":"Find licensed Aetna Therapists in California",
  "url":
    "https://growtherapy.com/categories/california/aetna?address=CA%2C%20USA&specialty%5B0%5D=Anxiety&specialty%5B1%5D=D
    epression&setting=Virtual&typeOfCare=Talk%20therapy"
},
```

(**Figure 3** showing the patient's search being intercepted by the Segment Tracker)

47.    Grow then presents a list of providers matching the patient's search. The patient can visit each provider's profile, read his or her biography page, inspect the provider's reviews, and ultimately book the therapy session. Each provider profile lists the provider's specialties, licensing information, and the types of insurance he or she accepts. When visiting a provider's profile, the Segment Tracker intercepts a descriptive URL revealing the provider's name. *See, e.g.,* Figure 4.

```
"context":{
    "page":{
        "path":"/provider/qplgqdu7c1bz/karin-█████,
```

(**Figure 4,** showing the Segment Tracker collecting a name of a provider viewed by patient, last name redacted for privacy.)

48.    Next, the patient books a therapy session with a provider by selecting a time and date of their appointment, inputting insurance information (such as the insurance name and member ID), and contact information—including full name, email address, phone number, date of birth, address, sex, and payment information. Once the patient completes the appointment scheduling form and clicks on the "Book now" button, the Segment Tracker intercepts the patient's form inputs, which contain sensitive information about the patient's therapy appointment and their payment information.

49.    Specifically, the Segment Tracker intercepts, in real time, the patient's form submission revealing Sensitive Medical Information to unannounced third parties including:

(a)    Patient's full name

(b)    Patient's email address

(c)    Patient's phone number

CLASS ACTION COMPLAINT                          12                          CASE NO. 26-cv-2609

(d)     Patients' location

(e)     Provider's name

(f)     Insurance name or payment type

(g)     Insurance ID

(h)     Medical condition

(i)     Appointment time and date

50.     Indeed, Grow makes various representations to patients encouraging patients to "Learn how Grow Therapy keeps your data safe and secure," and promises to handle "provider and client information with the utmost care."

51.     Grow also explicitly assures patients that it will obtain their "written authorization" before it uses or discloses patient health information for marketing purposes or sells patient health information. *See* Figure 5.

All other uses and disclosures, not previously described, may only be done with your written authorization. We will also obtain your authorization before we:

- Use or disclose your health information for marketing purposes;
- Sell your health information; or
- Share your psychotherapy notes (in most cases).

**(Figure 5)**

52.     At no point did Grow Twilio inform Plaintiffs and the Class (either directly or through the Grow telehealth platform) that any of their Sensitive Medical Information would be disclosed to anyone.   Nor did Grow Therapy inform its patients that it would be disclosing their Sensitive Medical Information to Defendant Twilio or obtain their consent to do so.

**D.     Twilio Knowingly Collects Grow Therapy Patients' Sensitive Medical Information**

53.     Twilio knows that Grow Therapy is one of its clients, that Grow Therapy is a telehealth platform, and that Grow installed the invasive Segment Tracker onto its telehealth platform, which gathers sensitive health data from patients when booking an appointment with a therapist.

54.     As a patient navigates the Grow telehealth platform and goes through the various steps to book a therapy appointment, Segment simultaneously and instantaneously intercepts and duplicates the patient's various communications with the platform and sends the information to itself.   Defendant

then analyzes the patient's Sensitive Medical Information and either creates a profile for the patient's activity, or matches the consumer's activity to an existing profile.

55. More specifically, as the Plaintiffs and the Class Members visited Grow's telehealth platform, they communicated to Grow their 1) contact information (including their full name, email address, and phone number), 2) their medical information, including any mental health diagnoses and preferred treatment modalities, 3) insurance information (the name of their insurance provider and whether they are self-paying with cash), and 4) appointment booking details (including the name of their chosen provider and the time & date of their appointment).  Twilio simultaneously and instantaneously intercepted and transmitted these communications (*i.e.*, the "Sensitive Medical Information") to itself for instantaneous analysis to create and enhance Plaintiffs' and the Class Members' user profiles.

56. In addition to creating and enhancing user profiles for Grow's benefit, Twilio uses this Sensitive Medical Information to continue to train its artificial intelligence technology to improve its services writ-large, beyond providing and improving its services to Grow, including, upon information and belief, services for other Twilio clients.

57. The Segment Tracker evades patient detection by design.  It is built into the telehealth platform, and the patient has no control or warning over its presence or data collection.  The Segment Tracker may not be deleted from the patient's device, and patients cannot prevent or even detect the transmission of their sensitive health data.  Indeed, collection takes place before a patient even creates an account with Grow.

58. In addition to intercepting, duplicating, and redirecting Plaintiffs' and the Class Members' sensitive medical health information, the Segment Tracker also transmitted the fact that the information originated from a telehealth platform (including the URL and name of the telehealth platform).  Twilio thus knew that this tracker was collecting data from a mental health care provider, and that the communications featured sensitive health information.

59. On information and belief, Twilio does not have any safeguards in place to ensure that Sensitive Medical Information is not intercepted by the Segment Tracker.

**PLAINTIFFS' EXPERIENCES**

60.    Plaintiff E.R. has booked at least one therapy session on the Grow Therapy telehealth platform within the past year.  In doing so, he provided his Sensitive Medical Information to Grow including, but not limited to, his full name, email, phone number, information about his medical condition, payment information, and he selected a provider and a time and date for his appointment.  Unbeknownst to Plaintiff E.R., Defendant Twilio intentionally and knowingly intercepted, in real time, the content of his booking form submission.  In doing so, Twilio obtained Plaintiff E.R.'s Sensitive Medical Information.  Plaintiff E.R. had a reasonable expectation of privacy that his medical information would remain safe and confidential.  Not only was Plaintiff E.R.'s Sensitive Medical Information protected under HIPAA, but Grow's policies also claim that Plaintiff E.R.'s Sensitive Medical Information would not be disclosed to anyone without written authorization.  Plaintiff E.R. never gave his consent—written or otherwise—to Twilio nor to Grow to disclose his Sensitive Medical Information to third parties for any purpose.  Plaintiff E.R. is extremely disturbed that his Sensitive Medical Information was disclosed to third parties without his consent.

61.    Plaintiff C.N. has booked at least one therapy session on the Grow Therapy telehealth platform within the past year.  In doing so, she provided her Sensitive Medical Information to Grow including, but not limited to, her full name, email, phone number, information about her medical condition, payment information, and she selected a provider and a time and date for her appointment.  Unbeknownst to Plaintiff C.N., Defendant Twilio intentionally and knowingly intercepted, in real time, the content of her booking form submission.  In doing so, Twilio obtained Plaintiff C.N.'s Sensitive Medical Information.  Plaintiff C.N. had a reasonable expectation of privacy that her medical information would remain safe and confidential.  Not only was Plaintiff C.N.'s Sensitive Medical Information protected under HIPAA, but Grow's policies also claim that Plaintiff C.N.'s Sensitive Medical Information would not be disclosed to anyone without written authorization.  Plaintiff C.N. never gave her consent—written or otherwise—to Twilio nor to Grow to disclose her Sensitive Medical Information to third parties for any purpose.  Plaintiff C.N. is extremely disturbed that her Sensitive Medical Information was disclosed to third parties without her consent.

## CLASS ACTION ALLEGATIONS

62.     **Class Definition:** Plaintiffs E.R. and C.N. bring this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and the following Class and Subclass of others similarly situated, defined as follows:

**Nationwide Class:** All individuals residing in the United States who booked an appointment on the Grow Therapy telehealth platform on or after March 25, 2024.

**California Subclass:** All individuals residing in the State of California who booked an appointment on the Grow Therapy telehealth platform on or after March 25, 2025.

63.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

64.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

65.     **Numerosity**: The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose private information may have been improperly disclosed to third parties, and the Class is identifiable within Defendant's records.

66.     **Commonality & Predominance**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members.  These include:

(a)     Whether Defendant Twilio intentionally intercepted any of Plaintiffs' and Class Members' communications with Grow;

(b)     Whether Defendant Twilio's Segment Tracker is a device used to intercept Plaintiffs' and Class Members' communications with Grow;

(c)     Whether the Segment Tracker's design renders it primarily useful for the purpose of surreptitious interception of electronic communications;

(d)    Whether Defendant Twilio knew or had reason to know that the Segment Tracker's design renders it primarily useful for the aforementioned purpose;

(e)    Whether Plaintiffs and the Class Members consented to the aforementioned interception of their communications with Grow;

(f)    Whether Plaintiffs and the Class were injured by Defendant's conduct;

(g)    Whether Defendant Twilio used, or had the capability to use the data obtained from this interception for its own benefit; and,

(h)    Whether Plaintiffs and the Classes are entitled to damages as a result of Defendant's conduct and if so in what amount.

67.    **Typicality**: Plaintiffs' claims are typical of those of other Class Members because all had their Sensitive Medical Information compromised as a result of Defendant's conduct.

68.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class.  Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members.  Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

69.    **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.  Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant.  Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

70.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class,

thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole.  Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

71.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

72.     The litigation of the claims is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

73.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records and/or the records of Grow Therapy.

74.     Unless a class-wide injunction is issued, Defendant may continue disclosing the Sensitive Medical Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

75.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

**CAUSES OF ACTION**

**COUNT I**
**Violations of Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**(On behalf of Plaintiffs and the Nationwide Class)**

76.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

77.     The Electronic Communications Privacy Act ("ECPA") prohibits any person from intercepting or from procuring any other person to intercept electronic communication.  18 U.S.C. § 2511(1)(a).  Furthermore, the ECPA prohibits any person disclosing to any other person the content of an electronic communication.  18 U.S.C. § 2511(1)(c).

78.     Communications with Plaintiffs and the Class and the Grow Therapy telehealth platform are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

79.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

80.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

81.     The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5). The following instruments constitute "devices" within the meaning of the ECPA:

(a)     The Segment Tracker

(b)     The web servers owned and operated by Twilio which accept, store, and analyze Plaintiffs' and the Class's data; and,

(c)     Plaintiffs' and Class members' mobile devices and/or computers.

82. Plaintiffs and the Class's interactions with the Grow Therapy telehealth platform are electronic communications within the meaning of the ECPA. The transmission of their Sensitive Medical Information is "content" of the electronic communication.

83. By collecting Sensitive Medical Information from the Grow telehealth platform via the Segment Tracker, including health diagnoses and appointment booking, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

84. On information and belief, Defendant intercepted Plaintiffs and the Class Members' communications for the purposes of using their individually identifiable health information to train its artificial intelligence algorithms, to create unified user profiles for potential use by other third-parties (not just Grow), and to increase the marketability and value of its targeted marketing products to other third-parties, violating 42 U.S.C. § 1320d-6 of the Health Insurance Portability and Accountability Act ("HIPAA") and its implementing regulations.

85. Plaintiffs and the Class did not authorize Defendant to acquire the content of their communications for any purpose whatsoever. Plaintiffs and the Class had an expectation of privacy that their Sensitive Medical Information would not be disclosed with third parties without their knowledge or consent.

86. As such, Plaintiffs seek statutory damages in the amount of $10,000 per violation pursuant to 18 U.S.C. § 2520 including costs and attorneys' fees.

**COUNT II**
**Violations of Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2512 *et seq*.**
**(<u>On behalf of Plaintiffs and the Nationwide Class</u>)**

87. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

88. 18 U.S.C. § 2512 holds "any person" liable who manufactures, assembles, or sells, "any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce." 18 U.S.C. § 2512(1)(b).

89.    The Segment Tracker, at issue here, is an "electronic, mechanical, or other device" as defined by § 2510(5) and it is primarily useful for the purpose of the surreptitious interception of electronic communications.

90.    Twilio manufactured, marketed, and sold its Segment Tracker with knowledge that it would be primarily useful to illegally intercept electronic communications.

91.    Accordingly, Plaintiffs seek statutory damages in the amount of $10,000 per violation pursuant to 18 U.S.C. § 2520 including costs and attorneys' fees.

**COUNT III**
**Violation of the California Information Privacy Act ("CIPA")**
**Cal. Pen. Code §§ 631-632**
**(On behalf of Plaintiffs and the California Class)**

92.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

93.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

94.    California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

95.    At all relevant times, Defendant tracked and intercepted Plaintiffs' and Class Members' communications with the Grow telehealth platform.  These communications were transmitted to and intercepted without the knowledge, authorization, or consent of Plaintiffs and Class Members.

96.     Defendant intentionally used an electronic listening device that, without Plaintiffs' or the Class members' knowledge and consent, tracked and transmitted the substance of their confidential communications with Grow Therapy to Twilio, which constitutes a "person" within the meaning of the statute.

97.     Defendant knowingly and willingly intercepted Plaintiffs' and Class Members' Sensitive Medical Information by programming the Segment Tracker to collect patient data from the Grow Therapy telehealth platform.  Defendant knew or had reason to know that the content of the intercepted communication was Sensitive Medical Information.

98.     The Segment Tracker constitutes a "machine, instrument, or contrivance" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

99.     Defendant failed to disclose its use of the Segment Tracker to Plaintiffs and the Class members, much less seek any consent whatsoever from Plaintiffs and the Class Members.  Nor was such consent procured on Twilio's behalf by a third party like Grow Therapy.

100.     Twilio designed the Segment Tracker to transmit Plaintiffs' and the Class's actions and communications contemporaneously, instantly and in real-time as the user communicates with Grow's platform.

101.     By obtaining Plaintiffs' and Class Members' Sensitive Medical Information, Defendant violated Plaintiffs' and Class Members statutorily protected right to privacy.

102.     Plaintiffs' and the Class Members' Sensitive Medical Information is considered a "confidential communication" under Cal. Pen. Code § 632(c) because it arose in circumstances "as may reasonably indicate that any party to the communication desires it to be confined to the parties . . . ."

103.     As a result of the above violations, and pursuant to § 637.2, Defendant is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

104.    Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT IV**
**Violation of the California Information Privacy Act ("CIPA")**
**Cal. Pen. Code § 635**
**(On behalf of Plaintiffs and the California Class)**

105.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106.    Cal. Pen. Code § 635(a) holds "every person" liable who manufactures, sells, offers for sale, or furnishes to another "any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another."

107.    The Segment Tracker, at issue here, is a device primarily designed to surreptitiously eavesdrop on communications.  Here, Defendant Twilio used the Segment Tracker to eavesdrop on communications between Plaintiffs and the Class Members and the Grow telehealth platform.

108.    As a result of the above violation, and pursuant to § 637.2, Defendant is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation.  Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

109.    Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs E.R. and C.N. individually and on behalf of the Class, pray for the following relief:

a.    An order certifying the Classes as defined above, appointing them as the representatives of the Classes, and appointing their counsel as Class Counsel;

b.    An order declaring that Defendant's actions, as set out above, violate the ECPA and the CIPA;

c.       An injunction requiring Defendant to cease all unlawful activities;

d.        An award of statutory damages, disgorgement of profits, costs, and attorneys' fees; and,

e.       Such other and further relief that the Court deems reasonable and just.

### JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.


                                        Respectfully Submitted,

Dated: March 25, 2026                    By: */s/ Yaman Salahi*

                                        Yaman Salahi (SBN 288752)
                                        yaman@salahilaw.com
                                        Nicole Cabañez (SBN 365099)
                                        nicolec@salahilaw.com
                                        Taylor Applegate (SBN 357742)
                                        taylora@salahilaw.com
                                        **Salahi PC**
                                        505 Montgomery Street, 11th Floor
                                        San Francisco, CA 94111
                                        Tel: (415) 236-2305

                                        Albert Plawinski*
                                        **PLAWINSKI, PLLC**
                                        2101 Pearl St.
                                        Boulder, Colorado 80302
                                        Tel: (303) 720-7095
                                        Email: albert@plawinski.law

                                        *Pro Hac Vice admission forthcoming*

                                        *Counsel for Plaintiffs and the proposed Class*